UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LANITA DOTSON,

                    Plaintiff,

    v.                                          Case No. 20-cv-1767-bhl

JAMES FAULKNER,

                    Defendant.

_____

## DECISION AND ORDER

_____

On November 30, 2020, Plaintiff Lanita Dotson filed this lawsuit against Defendant James Faulkner and others, seeking to impose liability and recover damages under 42 U.S.C. §1983 based on Faulkner's physical and sexual assault of Dotson while she was incarcerated. For his actions, Faulkner is now serving a fourteen-year bifurcated sentence after being found guilty of 2nd Degree Sexual Assault by Correctional Staff.. Faulkner was served with the summons and complaint in this matter on March 18, 2021, *see* Dkt. Nos. 11, 48, but he did not file a responsive pleading. The Clerk of Court entered default against Faulkner on July 25, 2022.[1] Plaintiff moved for entry of default judgment against Faulkner a few weeks later. On December 18, 2023, the Court granted Plaintiff's motion for entry of default and set a January 31, 2024 hearing to determine damages. The Court also ordered Plaintiff to file a brief summarizing her damages along with any supporting documentary evidence by January 17, 2024.

Plaintiff's Counsel timely filed a brief and supporting materials concerning Plaintiff's damages. Among the supporting materials was a psychiatric life care plan prepared by Dr. Debbie

_____

[1] On October 24, 2023, the Court dismissed Plaintiff's claims against all Defendants except Faulkner. Dkt. No. 92.

Layton, who opined that Plaintiff continues to suffer significant psychological stress that will require lifelong intervention. With a remaining life expectancy of 43 years, Dr. Layton estimated a total cost of $610,400 for Plaintiff's future psychiatric care. Dr. Layton also estimated additional medication costs of between $4,800 and $10,000 per year. She confirmed that her estimates were not adjusted for inflation or increases in cost of care over time, and no present value analysis was offered. *See* Dkt. No. 103-1.

On January 31, 2024, Plaintiff appeared along with three lawyers to present her damages evidence. She testified to the circumstances underlying her claim and described the pain and suffering she experienced as a result of Defendant's misconduct. She detailed her three encounters with Faulkner, explaining how he isolated her and twice forced her to perform sex acts on him. She also explained that, between the first and second assaults, he strangled her until she blacked out and threatened her not to tell anyone what had happened. Plaintiff testified that shortly after Faulkner was arrested, she tried to kill herself by slitting her wrists. She states that she was sent to a mental hospital where she was diagnosed with PTSD, major depressive disorder, sleep disorders, and antisocial personality disorder, all of which were directly correlated to Faulkner's actions. Plaintiff started weekly therapy and medication; she currently takes medication to help her cope, has recurring nightmares and panic attacks, and rarely leaves the house because she has difficulty being around people, particularly when she is alone. Plaintiff compared her existence to the movie Groundhog Day, explaining that she relives those experiences every day and is frequently triggered by sounds of keys jangling or certain smells. Plaintiff's testimony was credible and compelling. The Court finds that, even years later, she continues to be significantly impacted by Faulkner's misconduct.

Plaintiff's Counsel also offered argument. They asked the Court to award a total of $10 million--$4.5 million in compensatory damages to cover future medical costs, lost wages, and pain and suffering, and $5.5 million in punitive damages. Counsel argued that Plaintiff had been a model prisoner and had worked hard to earn a degree so she could be a productive and model citizen after her release from prison. Counsel asserted that the man responsible for protecting Plaintiff destroyed her dreams and ruined her life. Counsel requested that the Court award damages for each incident separately.

Before it closed the evidence, the Court raised a number of basic evidentiary issues. The Court noted that while Counsel had filed an expert report detailing the need for future medical care, no foundation was laid for the expert report. The expert did not testify and her report was simply offered by Counsel during Plaintiff's testimony. The Court also noted that the expert report estimated Plaintiff's future medical costs but failed to reduce the number to a present value. Finally, the Court observed that while Counsel argued for damages based on Plaintiff's loss of future income, Counsel had not introduced evidence to support such an award. Before ending the hearing and taking the matter under advisement, the Court gave Plaintiff an opportunity to cure two of the evidentiary failures the Court had identified. In particular, the Court gave Plaintiff fourteen days to supplement the record with: (1) an affidavit or unsworn declaration authenticating her expert's report; and (2) a present value analysis related to her request for future medical costs. Dkt. No. 104.

On February 12, 2024, Plaintiff's Counsel submitted a "Sworn Statement of Debbie Layton-Tholl," in an effort to authenticate the expert report. Dkt. No. 105. Contrary to the filing's title, the statement is not sworn—it is not notarized, nor does it comply with the language requirements in 28 U.S.C. §1746 for unsworn declarations under penalty of perjury. Attached to

the "Sworn Statement," Counsel included a single-page printout of a spreadsheet entitled "Dotson Life Care Plan Present Day Calculation – 2024." Dkt. No. 105-1. The printout states it was prepared by Counsel, Joseph W. Seibert, and purports to show that Plaintiff's claimed future medical care costs, when reduced to present value, are $1,185,766.38, nearly twice the original submitted total. Two days later, on February 14, 2024, Plaintiff's Counsel filed a "Supplemental Brief of Damages." Dkt. No. 106. The filing purports to add, among other things, unauthenticated evidence of future lost wages. *Id.* The filing also incorporated Counsel's February 12, 2024 present value calculation and offered additional damages arguments. *Id.*, Dkt. No. 106-1.

## 1. Plaintiff Is Entitled to Compensatory Damages, But Counsel's Submissions Remain Flawed

There are two stages in a default proceeding: first, the establishment of the default, and second, the entry of a default judgment. Once a default is established, the plaintiff must establish her entitlement to whatever relief she seeks. *See In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004). The district court, based upon evidence presented by the plaintiff, must "ascertain the amount of damages with reasonable certainty." *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 602 (7th Cir. 2007) (citations omitted).

Based on the submitted evidence—or, more accurately, the lack of submitted evidence—the Court is unable to award Plaintiff damages for her future lost wages or future medical costs. While Plaintiff requests both, she has not proved either with any degree of certainty or by competent evidence. Indeed, the Court feels compelled to observe that Plaintiff's Counsel have done their client little help. Despite no opposition and having had ample notice of the need to prove damages and even after being given extra time to cure basic evidentiary defects that the Court flagged for them, Counsel have failed to comply with basic law on damages and the rules of evidence.

As the Court noted at the damages hearing, Plaintiff's expert report cannot be admitted without an evidentiary foundation. The rules of evidence are more relaxed in connection with proving damages following entry of default, so, for example, an expert report can be authenticated by an affidavit or unsworn declaration rather than in-person testimony. *See* Fed. R. Evid. 901(b); *see, e.g.*, *e360 Insight*, 500 F.3d at 602 (holding that damages may be determined from documentary evidence or detailed affidavits). But the rules still apply, so Counsel and Plaintiff's assurances that the report is what it purports to be is insufficient to authenticate it. The Court apprised Counsel of this issue at the January 31, 2024 damages hearing and, although Counsel asserted he could file an affidavit or declaration authenticating the report within a week, the Court allowed Plaintiff two weeks to supplement the record. Doing so should not have been a challenge in the present day of email communications, pdfs, and electronic filing. Yet rather than filing an affidavit or declaration authenticating the report as permitted, Counsel conflated the two and, in doing so, failed to satisfy the requirements of either.

A federal statute, 28 USC §1746, provides a straightforward procedure and simple language for use by parties submitting unsworn declarations under penalty of perjury in federal court. If the statute is complied with, a party's unsworn declaration serves as the equivalent of an affidavit. *See, e.g.,* Fed. R. Civ. P. 56(c)(4). Counsel therefore could have filed a simple declaration using the language set forth in §1746 and signed by Dr. Layton, and Plaintiff's authentication issue would have been solved. Or Counsel could have filed an affidavit signed by Dr. Layton before a notary public, authenticating her report and, that too, would have solved the evidentiary problem. Instead, Counsel filed an unnotarized "Sworn Statement" that does not comply with §1746.[2] Dr. Layton's report thus remains without a proper evidentiary foundation

---

[2] The statute does not require perfect compliance with its prescribed wording, but it does require the unsworn declaration to "substantially" use form language. Plaintiff's Sworn Statement does not substantially use the language in the statute. As a basic

and cannot be the basis for an award of damages. *See Bates v. Atlantic Transportation, Inc.*, No. 18-cv-1581-JRS, 2021 WL 75163, at *2 (S.D. Ind. Jan. 8, 2021) (disregarding submitted exhibits as insufficient because they were not authenticated or otherwise supported by an affidavit or unsworn declaration and holding that "claimed damages must be adequately supported by admissible proof.").

Plaintiff's claim for future medical costs as detailed in the expert's report must be disregarded for an additional reason. Rather than addressing the two basic evidentiary issues flagged by the Court (no authentication and no present value analysis), Counsel took the opportunity to nearly double Plaintiff's request for future medical costs. Attached to the "Sworn Statement" was an "Information Sheet Exhibit" apparently prepared by Counsel. Counsel offered this table in the guise of supplementing the record with a present value analysis for Plaintiff's future medical costs, which Counsel had presented to the Court as an estimated $610,400. Instead of *reducing* that figure to present value, Counsel's printout *nearly doubled* the amount previously presented, abusing the Court's offer for limited supplementation.

As explained at the damages hearing, Dr. Layton's estimate of future medical costs needed to be reduced to a present value. The law is clear that damages based on costs and expenses to be paid in the future must be reduced to a present value "to give the plaintiff an amount of money which, invested safely, will grow to a sum equal to [the future amount]." *See O'Shea v. Riverway Towing Co.*, 677 F.2d 1194, 1199 (7th Cir. 1982). This is a basic tenet of the law of damages, yet Plaintiff's initial claim for future medical costs failed to account for it. Despite the Court alerting Plaintiff's Counsel to this issue and allowing them fourteen days to address it, Counsel offers an

matter, the statute concerns "unsworn declarations" while Plaintiff branded her submission a Sworn Statement. And while the document uses the words "under" and "penalty of perjury," it does not include language that the contents are "true and correct." While use of these words or their substantial equivalent may seem pedantic, it is not hard. There is no justifiable excuse for Counsel not to use the simple words of the statute. A typo or minor error could be forgiven, but Counsel's submission shows a wholesale lack of care for compliance with the statute.

entirely new damages calculation that first applies a generous "medical inflation" rate of 4.3% and includes more than $300,000 in medication costs before reducing that revised amount to present value. *See* Dkt. No. 105-1. The net effect is an *increased* demand for medical costs from $610,400 to $1,185,766.38.

Plaintiff's new claim will be rejected, most fundamentally because it is not a present value calculation based on the previously submitted evidence and thus goes well beyond the limited supplementation the Court allowed. In addition, the calculation was prepared by Counsel, who is not an economist or accountant or otherwise qualified to opine on inflation rates or annual increases in medical costs. Given the lack of a foundation for the calculations upon which Plaintiff's claim is based and the other identified deficiencies, the Court has no choice but to disregard Plaintiff's claim for future medical care and supplies as she has failed to carry her burden of proving those damages. *See Assaf v. Trinity Medical Center*, 821 F.3d 847, 848 (7th Cir. 2016) (explaining that "the party seeking to recover damages . . . bears the burden of proving that he did, in fact, suffer actual damages and must establish a reasonable basis for computation of those damages").

Similarly, although Plaintiff testified about her current inability to work, Counsel presented no evidence to substantiate those damages to a reasonable degree of certainty. There was no effort at the hearing to show through competent evidence the wages or earning capacity that she has lost or is reasonably certain to lose because of her inability to work. Following the hearing, Plaintiff's Counsel filed a supplemental brief explaining that during Plaintiff's incarceration she completed a six- to eight-month certification program to qualify her as a dental lab technician. Plaintiff's Counsel also noted that Plaintiff "has been determined to be disabled an[d] unable to work" and has applied for disability payments but has not yet received any income. These conclusory

assertions are both untimely and inadequate. The hearing on damages took place on January 31, 2024. The Court closed the evidence subject to two specific exceptions for which it allowed Plaintiff to supplement the record. Neither of those exceptions encompassed the submission of additional evidence concerning lost wages. Given the lack of timely and competent evidence on this category of compensatory damages, the Court cannot assess damages for lost wages or earning capacity.

Plaintiff has offered compelling evidence for pain and suffering damages, however. She described in credible detail the harm she suffered and continues to suffer based on Defendant's assaults. Her sworn testimony made clear that she suffered and continues to suffer physical, mental, and emotional pain and suffering. As noted, she testified credibly, frequently pausing to control her emotions. She explained how she continues to have nightmares, often wakes up screaming, and is uncomfortable around people, so she rarely leaves her home. At one point, she noted that her stomach hurt from having to describe the assaults in detail, and at another point, she asked for a break so she could compose herself. Plaintiff clearly continues to be deeply impacted by Faulkner's egregious misconduct, and the Court is satisfied that his actions dramatically altered the course of her life, transforming her from a person full of hope and excitement about her future into one plagued by fear and anxiety. This evidence is sufficient to support an award of $1 million in compensatory damages for her pain and suffering.

## 2. Plaintiff Is Entitled to Punitive Damages

The Court now turns to punitive damages. The Court concludes that Plaintiff is entitled to punitive damages because it finds that Faulkner's conduct was both malicious and in reckless disregard of Plaintiff's rights. Faulkner did not testify, but Plaintiff's testimony confirms that he acted with malice and in complete disregard of Plaintiff's rights. His misconduct, for which he is

serving a fourteen-year sentence, is particularly awful given that he exploited his position of authority to victimize a person dependent upon him for her safety and well-being. Faulkner believed he was untouchable, taunting Plaintiff that no one would believe her word over his. Plaintiff's courage and quick-thinking is likely the only reason the assaults did not continue. Faulkner will not be able to repeat his misconduct given his criminal conviction and sentence, but a strong message of deterrence must be sent to him and any other correctional officer who would so betray their responsibility to supervise the prisoners under their care. Having considered all the factors relevant to a determination of punitive damages, *see, e.g., Kemezy v. Peters*, 79 F.3d 33 (7th Cir. 1996), the Court will award Plaintiff $3 million in punitive damages.

### 3. Scope of Employment

At the conclusion of the hearing and again in her supplemental briefing, *see* Dkt. No. 106, Plaintiff requested that the Court find that Faulkner's acts fell within the scope of his employment. As the Court has previously explained to Counsel, this issue is not before the Court. Although default judgment against Faulkner necessarily assumes he was acting *under color of law* when he violated Plaintiff's rights, that does not mean he was acting *within the scope of his employment*. *See Robinett v. City of Indianapolis*, 894 F.3d 876, 881 (7th Cir. 2018) (explaining that an employee can act under color of state law even if he misuses state power). The mere fact that Plaintiff alleged in her complaint that Faulkner was acting within the scope of his employment does not make it so, as "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Notably, Plaintiff never sued Faulkner's employer, so this issue was never litigated. The Court therefore offers no opinion on whether Faulkner was acting within the scope of his employment when he assaulted Plaintiff.

9

**IT IS THEREFORE ORDERED** that Plaintiff is awarded compensatory damages of $1,000,000 and punitive damages of $3,000,000. The Clerk of Court shall enter final judgment accordingly.

Dated at Milwaukee, Wisconsin on February 27, 2024.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge